```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE 1228 INVESTMENT GROUP, L.P.,   :   CIVIL ACTION
                                   :   NO. 21-1078
          Plaintiff,               :
                                   :
     v.                            :
                                   :
HUB GROUP, INC.,                   :
                                   :
          Defendant.               :
```

**M E M O R A N D U M**

**EDUARDO C. ROBRENO, J.**                          **OCTOBER 17, 2022**

## I.   INTRODUCTION

Before the Court are Defendant/Third-Party Plaintiff Hub Group, Inc.'s Motion for Partial Summary Judgment (ECF No. 25) and Plaintiff The 1228 Investment Group and Third-Party Defendant TheITSupportCenter LLC's Response in Opposition (ECF No. 26). Hub Group, Inc. ("Hub") requests Partial Summary Judgment on three grounds.

First, Hub argues that, in the event it owes any damages at all for any breach it may have committed, The 1228 Investment Group ("1228") is not entitled to expectancy damages in the form of lost profits. Def.'s Mot. 8-11.  Hub claims that lost profits--profits exceeding the contract price--are not available here as the contract only explicitly provided for a $15,700 monthly stream of income for ITSC. Id. at 10-11. Moreover, Hub

1

states that 1228 has not met its burden in proving lost profits. Id. at 8-9.

Second, Hub argues that ITSC was in material breach of the audit clause of the contract such that summary judgment is warranted in Hub's favor on its claim for breach of contract against third-party defendant, TheITSupportCenter, LLC ("ITSC"). Id. at 11-15. Hub contends that the contract clearly required ITSC to maintain detailed records, and its failure to do so, even after repeated requests from Hub for additional information, constituted a material breach of the entire agreement. Id. at 12-14.

Third, Hub claims that 1228 should be dismissed from the case because ITSC's assignment of its claim against Hub is barred by the doctrine of champerty. Id. at 15-19.

Plaintiff 1228 counters by arguing first that it is entitled to damages beyond the monthly minimum commitment, based upon the course of performance of the contract and the pre-formation negotiations, which indicated that Hub may frequently exceed the monthly minimum commitment. Pl.'s Resp. in Opp'n (Pl.'s Br.) 15-22, ECF No. 26. 1228 states that the course of dealing and the mandatory language used in the support access provision of the contract, which it argues that Hub had breached, provide sufficient evidence that 1228 is entitled to in excess of the monthly minimum commitment. Id. at 17-20. 1228

2

also argues that there is sufficient evidence to establish lost profits with reasonable certainty because 1228 has approximately five months of usage data to draw from in extrapolating expected profits for the remaining Term of the contract. Id. at 20-21.

Second, 1228 argues that ITSC provided Hub with a "plethora" of information regarding Hub's usage of ITSC's services, and regardless, Hub, not ITSC, was in material breach of the contract. Id. at 22-26. 1228 states that ITSC did in fact provide information concerning not only monthly average usage, but also provided raw data that contained per-Ticket information. Id. at 24.

Finally, Plaintiff states that the assignment of ITSC's claim to Hub was not champertous because 1228 has a financial interest in the litigation by way of Jeffrey Becker's connection to both entities. Id. at 12-15.

Because Hub has failed to meet its burden of showing there is no genuine dispute of material fact as to these issues, its Partial Motion for Summary Judgment shall be dismissed.

**II. BACKGROUND**

    **A. The Contract**

Hub and ITSC entered into a Master Services Agreement ("MSA") and a Statement of Work ("SOW"), collectively the Contract, on August 28, 2020. Def.'s Mot. 2; Master Services Agreement and Statement of Work, ECF No. 26-1. In the event of

3

any conflict between the two documents, the SOW was to control. MSA ¶ 1; cf. id. ¶ 4 ("Unless otherwise expressly specified in an applicable SOW, Contractor acknowledges and understands that Hub Group has made no promises or representations whatsoever as to the amount or potential amount of business Contractor can expect at any time during the Term . . . ."); id. ¶ 18(a) (providing that "Hub Group may terminate this agreement" in a particular manner, "unless otherwise specified in a SOW"). The Term of the Contract was one year. SOW ¶ 4. The SOW provided that ITSC "will furnish to Hub Group computer support assistance and documentation of the support provided for products operated/used by the Hub Group." SOW ¶ 1. The SOW stated that Hub employees "shall have direct access" to ITSC's help desk services via an internal help desk phone number, an email that routes directly to ITSC, and online portal inquiries, regarding a number of service areas. SOW ¶ 11.

The Contract also specified that ITSC would make certain documents available to Hub. The MSA stated that ITSC "shall maintain complete and accurate records of any invoices and supporting documentation for all amounts billed to, and payments made by, Hub Group . . . ." MSA ¶ 7. The Audit provision further stated that, "[u]pon Hub Group's written request, [ITSC] shall provide to Hub . . . access at all reasonable times . . . to copies of such documentation and other data, records, and

4

information . . . relating to the Services and each invoice as may be reasonably requested by Hub Group." Id. The purpose of such provision was to "conduct audits of the invoices to . . . examine [ITSC's] performance of the Services, that [ITSC's] charges are accurate and valid in accordance with [the Contract], and [ITSC's] compliance with the terms of [the Contract]." Id. The audit provision contemplated that there may be overcharges or undercharges, and upon discovery of such over- or under-charge, the liable party shall pay what is owed. Id. In addition, the SOW provided that "Hub Group will be granted web access to [ITSC's] servers to enable" real-time viewing of ITSC's help-desk services. SOW ¶ 12.

In exchange for support services and documentation, Hub would pay a monthly minimum of $15,700 to ITSC, for 6,200 "units" of support. Id. ¶ 2(b). A unit corresponded to approximately one minute of support services. Id. If Hub did not use the entire 6,200-unit package for a given month, the unused monthly units would roll over to the following month. Id. ¶ 4. On the other hand, if Hub required more than the 6,200-unit monthly commitment, ITSC would provide additional support units, called the Gap Amount. Id. ¶ 6.

Both the MSA and SOW provided for the termination of the Contract. Either party could terminate the contract within sixty (60) days of its commencement with fourteen (14) days written

5

notice. SOW ¶ 5. Hub could terminate without cause so long as it provided, in writing, at least sixty (60) days notice to ITSC. Id. The Contract also contained a for-cause termination provision:

> If [ITSC] materially breaches any terms of this Agreement and/or any SOW and after receiving written notice of such material breach (i) such breach is incapable of cure after a twenty (20) day period of diligent effort to remedy the breach, or (ii) with respect to such breaches capable of cure, [ITSC] does not cure such breach within thirty (30) days or such other reasonable period as determined by Hub Group after written notice of material breach . . . .

MSA ¶ 18(b).

### B. Course of Performance and Breaches

The Term began on October 15, 2020. Def.'s Mot. 4. Nearly immediately, Hub and ITSC began experiencing difficulties. Id. (referencing November 6, 2020, emails from Hub to ITSC questioning the quality of service provided by ITSC); Pl.'s Br. 6 (citing Becker Dep. 91:6-95:16, ECF No. 26-2, in which Becker states that difficulties arose in the relationship because Hub failed to provide adequate start-up information to ITSC regarding the services to be provided).

Invoices sent by ITSC indicated that Hub routinely used in excess of the monthly minimum. See generally ECF No. 26-3 (showing all invoices ITSC sent to Hub). The evidence submitted by the parties shows that Hub and ITSC discussed how Hub could reduce its costs. Email from Nicholas Tresp to Max Paredes &

6

David Parsons (Dec. 18, 2020), ECF No. 26-6; Email from Nicholas Tresp to Max Paredes (Jan. 24, 2021), ECF No. 26-7.

1228 argues that Hub was the first to breach by failing to provide Hub employees access to ITSC's services via a web portal, then disconnecting Hub employees' email-based access to ITSC's services, and finally by disconnecting employees' telephone access to the help desk. Amend. Compl. ¶¶ 24-26.

By contrast, Hub argues that ITSC continuously engaged in minor breaches of the Contract beginning in at least December 2020 by means of "ticket mis-categorization," "failing to properly identify as Hub Group's IT Service Desk when answering support calls," "failing to follow written resolution/escalation procedures," "failing to adequately document work performed for Hub Group's follow-up," and "lack of troubleshooting experience." Third-Party Pl.'s Compl. ¶ 12, ECF No. 6. Hub points to evidence that it provided regular notice to ITSC of its failure to comply with the letter of the Contract, but "ITSC failed to cure these prolonged and pervasive deficiencies within thirty (30) days of Hub Group sending notice to ITSC." Id. ¶¶ 13-14. Hub also interpreted ITSC's March 5, 2021, assignment of the claim to 1228 as a material breach, id. ¶¶ 18-19, and thereafter sent a Notice of Material Breach and Termination to ITSC. See Notice of Material Breach and Termination Letter (Mar. 11, 2021), ECF No. 6-1.

7

## III. LEGAL STANDARD

### A. Summary Judgment Standard

The Court must grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact, and so the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Razak v. Uber Techs., Inc., 951 F.3d 137, 144 (3d Cir. 2020) (quoting Anderson, 477 U.S. at 248). A fact is material where it "might affect the outcome of the suit." Anderson, 477 U.S. at 248.

All facts must be construed in the light most favorable to the nonmoving party. Abramson v. William Paterson Coll., 260 F.3d 265, 276 (3d Cir. 2001). In other words, the nonmoving party's "version of any disputed issue of fact thus is presumed correct . . . ." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 456 (1992). The court must take care not to weigh the evidence or make credibility determinations at this stage. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson, 477 U.S. at 249. Summary judgment cannot be granted where reasonable minds could differ on the inferences to be drawn from basic facts. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

B. **Material Breach**

Generally, materiality of a breach is an issue for the jury, but a court may decide whether a breach is material at the summary judgment stage if "the breach goes directly to the essence of the contract." Am. Diabetes Ass'n v. Friskney Family Trust, LLC, 177 F. Supp. 3d 855, 867 (E.D. Pa. 2016) (citing Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P., 40 A.3d 1261, 1272 (Pa. Super. 2012) and Manning v. Kelly, 2015 WL 9464459, at *13 (Pa. Super. 2015)). When a breach of contract "go[es] directly to the essence of the contract, which is so exceedingly grave as to damage the trust between the contracting parties, the non-breaching party may terminate the contract without notice, absent explicit contractual provisions to the contrary" because any attempt to cure would be meaningless. LJL Transp., Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 652 (Pa. 2009). A court may also decide whether a material breach has occurred when the contract itself defines material breach. E.g., EMD Performance Materials Corp. v. Marque of Brands Ams. LLC, 578 F. Supp. 3d 670, 689 (E.D. Pa. 2022). When one party to a contract materially breaches, the counterparty's duty to perform is suspended. LJL Transp., Inc., 962 A.2d at 648. Similarly, a party in material breach of a contract cannot insist on performance by their counterparty. Id.

### C. **Lost Profits**

Lost profits are recoverable in a breach of contract action if there is evidence that (1) the amount of lost profits alleged can be proved with reasonable certainty, (2) a loss of profits was foreseeable by the parties at the time of contract formation, and (3) the breach was a proximate cause of the lost profits. Co. Image Knitware, Ltd. v. Mothers Work, Inc., 909 A.2d 324, 336 (Pa. Super. 2006) (quoting Birth Ctr. v. St. Paul Co., Inc., 787 A.2d 376, 387-88 n.15 (Pa. 2001)).

"At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague, or contingent' upon some unknown factor." ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 669 (3d Cir. 1998) (quoting Spang & Co. v. United States Steel Corp., 545 A.2d 861, 866 (Pa. 1979)). "[A] lost profits calculus based solely on unsubstantiated speculation and conjecture cannot form the basis of recovery." Id. at 670. But, some uncertainty in the damages calculation is not fatal. Id.

The Restatement (Second) of Contracts contemplates that if the business of the contract "is subject to great fluctuations in volume, costs, or prices, proof will be more difficult." Restatement (Second) of Contracts § 352, cmt. b. But, "damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys

10

and analyses, business records of similar enterprises, and the like." Id. Additionally, "[e]vidence of past performance will form the basis for a reasonable prediction as to the future." Id.

### D. Champerty and Standing

As a basic matter of standing, breach of contract claims may be assigned under Pennsylvania law. Hedlund Mfg. Co., Inc. v. Weiser, Stapler & Spivak, 539 A.2d 357, 358 (Pa. 1988). Although the assignee of a right to sue is not a party to the contract, "privity is not an issue in cases involving an assigned claim because the assignee stands in the shoes of the assignor and does not pursue the cause of action in the assignee's own right." Id. (citing Gray v. Nationwide Mut. Ins. Co., 223 A.2d 8, 9 (Pa. 1966)). The assignee thus only has standing where the assignor has a viable claim for breach of contract. Id.

But, an assignee may lack standing where the assignment is champertous. An assignment is champertous "when the party involved: (1) has no legitimate interest in the suit, but for the agreement; (2) expends [its] own money in prosecuting the suit; and (3) is entitled by the bargain to share in the proceeds of the suit." Frank v. TeWinkle, 45 A.3d 434, 438-39 (Pa. Super. Ct. 2012); Westmoreland County v. RTA Grp., Inc., 767 A.2d 1144, 1148 (Pa. Commw. Ct. 2001). If an assignment of a

claim is champertous, then it is invalid, and the suit must be dismissed. WFIC, LLC v. LaBarre, 148 A.3d 812, 819 (Pa. Super. 2016) (quoting Frank, 45 A.3d at 438). Champerty is barred in Pennsylvania as "repugnant to public policy against profiteering and speculating in litigation . . . ." Frank, 45 A.3d at 438.

In determining whether the assignee-plaintiff has a legitimate interest in the suit, the Court may look to whether the assignee and assignor ever shared a business or employment relationship; whether the assignee was contacted by the assignor to bring the claim (or vice versa); whether the assignor ever brought that type of claim on its own before; or whether the assignee has any relationship to the defendant. E.g., Brandywine Heights Area Sch. Dist. v. Berks Cnty. Bd. of Assessment Appeals, 821 A.2d 1262, 1265 (Pa. Commw. Ct. 2003) (finding that an agreement between an assignee-investor and assignor-school district to find undervalued properties and file tax assessment appeals was champertous where the assignee was "not employed by the District, he was not involved in any case with the District as a property owner and he had no connection whatsoever to [the property in question]. Nor had [assignee] ever been previously contacted by the District to initiate such appeal"); Dougherty v. Carlisle Transp. Prods., Inc., 610 F. App'x 91, 93 (3d Cir. 2015) (concluding that an assignee could not have any legitimate interest in a claim where the assignee stated that "he purchased

12

[the assignor's] claim in order to litigate it," there was "no indication that [the assignee] ha[d] any personal interest in the dispute between [the assignor and defendant]," and, the assignee had no dispute "of his own" with the defendant); Frank, 45 A.3d at 440 (finding that, where an assignee's interest only arises "well after" the maters were complete, the assignee solicited claims, and the assignee had the "exclusive intent" of "institut[ing] claims against the assignors' attorneys in consideration of which Appellant agreed to share in a percentage of the recovery," the assignee's interest was not legitimate). But see Silver v. Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, No. 03-4393, 2004 WL 1699269, at *4 (E.D. Pa. July 28, 2004) (holding that an assignment was not champertous where the defendant, the law firm formerly retained by the assignor, communicated with assignor through the assignee before the lawsuit was filed, and the assignee was a principal of a corporation that paid a portion of the assignor's retainer fee to defendant).

A party may also have a legitimate interest in the suit when the assignor of a claim has a legitimate interest in the financial status of the assignee-plaintiff. See Gardner v. Surnamer, 608 F. Supp. 1385, 1391 (E.D. Pa. 1985) (finding that assignee-plaintiffs, as co-general partners and a limited partner of the assignor, had a legitimate interest in the

13

litigation because of their interest in the continued financial success of the assignor, and the general partner's potential exposure to personal liability for the debts of the limited partnership). By contrast, when the assignment of the claim is the but-for cause of the plaintiff's interest in the case, the assignment is invalid under the doctrine of champerty. Riffin v. Consol. Rail Corp., 363 F. Supp. 3d 569 (E.D. Pa. 2019), aff'd by Riffin v. Consol. Rail. Corp., 783 F. App'x 246, 248-49 (3d Cir. 2019).

In analyzing the second and third prongs of the champerty test, the Court must examine the assignment contract. For instance, where an agreement between assignee and assignor specifically provides that the assignee would be responsible for prepayment of fees as required (and did pay those fees) and would be entitled to one-third of the total recovery, the second factor was met. Dougherty, 610 F. App'x at 93.

**IV. DISCUSSION**

    **A.   Material Breach of Audit Provision**

Summary judgment cannot be granted on Hub's claim for breach because Hub has not pointed to sufficient evidence that, as a matter of law, clearly indicates that ITSC committed a material breach.

Hub complains that ITSC did not provide ticket-level information in invoices. Def.'s Mot. 5. The invoices themselves

admittedly are sparse. See generally ECF No. 26-3. But ITSC sent weekly or monthly call reports to Hub that detailed the number of resolutions and average number of units required per ticket resolution of a particular issue. See generally ECF No. 26-5. 1228 has set forth evidence that ITSC was responsive to Hub's audit requests and advised Hub on how it could reduce its overall usage and costs--while also noting that the usage volume was "[a]pproximately 6x the original shared figures." Email from Nicholas Tresp to Mike Daly, Max Paredes & David Parsons (Nov. 8, 2020) and Attachment: Service and Cost Considerations – Hub Group_201108.pdf, ECF No. 26-7. At this point in time--early November of 2020, ITSC had already suggested that Hub increase its monthly commitment to reduce 10-20% of its costs. Id. 1228 has also provided evidence that ITSC did in fact maintain and provide ticket-level information (rather than averages by category). See generally ECF No. 26-10. See also Pl.'s Br. 24 & nn. 7-8.

Moreover, 1228 has demonstrated that ITSC granted Hub real-time access to Ticket data so that Hub could monitor usage via access to the Cherwell and Case Tracker systems. Pl.'s Resp. 9. 1228 has also set forth credible evidence that all calls to the ITSC help desk "went through their own telephone system. . . So their [system] told you who's calling, the date of the call, the time of the call, the duration of the call, everything about

that call. Our reports also gave them back the application, the category, the subcategory . . . It provided everything for a complete audit." Becker Dep. 124:4-16, ECF No. 26-2. This suggests that Hub had all of the information it wanted at its fingertips and could have conducted its own audits of ITSC's services with its own information. Accordingly, Hub has not shown that ITSC's failure to provide the exact information it wanted in the exact format it wanted went to the "heart of the contract," as the evidence submitted to the Court demonstrates that Hub had access to all necessary information by which to audit ITSC's practices.

**B.   Lost Profits**

Hub has failed to demonstrate that, as a matter of law, 1228 is not entitled to lost profits exceeding the monthly minimum amount that ITSC was to receive. By contrast, the invoices submitted by 1228, if a true and accurate measure of the services provided, could enable a reasonable jury to conclude that 1228 is entitled to damages exceeding the contractual monthly minimum.

To be awarded, any type of damages must be reasonably certain or ascertainable. ATACS Corp., 155 F.3d at 669-70. 1228 has not submitted to the Court in support of its Brief (and it is unclear whether it has sent to Defendant) any calculations, documentations, or expert discovery underlying its

16

projected profits for the remainder of the Contract Term. And, Mr. Becker has admitted that the usage of ITSC services can vary widely, Becker Dep. 165:19-166:17, ECF No. 25-3 at 66-67 (stating that the volume of help desk use is highly variable but the variability tends to flatten out over longer time periods), which can create difficulty for a nonbreaching party in establishing sufficient certainty of damages, see Restatement (Second) of Contracts § 352, cmt. b. So, the basis for the $820,285.00 lost profits figure is not clear to the Court.

But, this issue is best left to a jury as Hub has not pointed to any case law that would indicate that 1228's use of past invoices could not, as a matter of law, form the basis for a lost profits calculation. Rather, courts generally accept past data as evidence of future for lost profit calculations. See, e.g., Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 681 (3d Cir. 1991); Integrity Carpet Cleaning, Inc. v. Bullen Cos., No. 08-4127, 2011 WL 31396, at *11 (E.D. Pa. Jan. 5, 2011) (finding that a party could demonstrate lost profits with reasonable certainty by looking to how much work on the contract had been completed and how much was left to go, and then calculating the resulting loss). Hub also cannot point to a liquidated damages clause anywhere in the Contract because there is no such provision limiting damages. See generally ECF Nos. 26-1, 26-2. By contrast, 1228, has pointed to sufficient evidence that a

17

reasonable jury could find that ITSC would have received in excess of $15,7000 a month had the Contract not been terminated. Accordingly, Hub's Motion for Partial Summary Judgment as to the issue of lost profits must be denied.

### C. Champerty

Hub's Motion for Partial Summary Judgment must also be denied as to its champerty claim because Hub has not pointed to evidence showing that, as a matter of law, 1228 as assignee-plaintiff lacks a legitimate interest in the case under Frank.

Hub has clearly shown--and 1228 does not dispute--that the latter two prongs of Frank are met. 1228 is funding the litigation. In exchange for an up-front payment to ITSC for the right to litigate the claim, 1228 as assignee "shall retain for its own account any amounts collected" pursuant to the assignment agreement. Assignment Contracts, Ex. I to Pl.'s Resp. in Opp'n, ECF No. 26-9.

But, Hub has not met its burden of showing that 1228 has no legitimate interest in the case; a genuine dispute remains as to the role of Jeffrey Becker as General Partner and a Limited Partner of 1228, as well as a director and member of ITSC. Becker Decl. ¶¶ 2, 5, ECF No. 26-11; see also 1228 Inv. Grp., L.P. v. BWAY Corp., No. 20-4328, 2021 WL 3511303, at *3 (E.D. Pa. Aug. 9, 2021) (stating that, in a similar case in which 1228

18

was assigned a claim by ITSC, "1228 is no stranger to this litigation").

Mr. Becker is deeply involved with both assignor and assignee: he and his family trust are the only entities involved in 1228, Becker Decl. ¶ 3, and Mr. Becker appears to control 1228, Becker Dep. 26:5-20, ECF No. 25-3; Id. 35:17-25. Mr. Becker has also stated that he and Mr. Tresp at ITSC were the persons responsible for assigning the claim to 1228.[1] Becker Dep. 113:6-14, ECF No. 25-3. Mr. Becker thus has a financial interest in both entities. Id. ¶ 6.

Although Defendant urges the Court to focus on ITSC and 1228 as distinct legal persona, Def.'s Mot. 17-18, it is hard to deny the extent of Mr. Becker's personal involvement in this case, as he signed both the MSA and SOW on behalf of ITSC. Moreover, Mr. Becker signed the Assignment Agreements on behalf of both ITSC and 1228. Assignment Contracts, Ex. I to Pl.'s Br., ECF No. 26-9. And, this lawsuit was filed one day after the assignment agreement was executed, which tends to suggest that ITSC was already considering the decision whether or not to sue, and was not solicited long-after-the-fact by 1228. Cf. Frank, 45 A.3d at 440 (finding that an assignee's solicitation of a claim

---

[1] It is unclear who the other members of ITSC are, if they exist. But, given Becker and Tresp state that they had authority, from an agency-law perspective, to assign the claim to 1228, the lack of information on the LLC's structure is likely immaterial.

19

well after it arose supports a finding of champerty rather than legitimate interest). Moreover, given the policy of the champerty doctrine, Hub has not met its burden of showing that an assignee and assignor with common ownership and control is engaging in such profiteering and speculation.

## V. CONCLUSION

For the foregoing reasons, Hub's Motion for Partial Summary Judgment must be denied on all grounds. First, 1228 has presented enough credible evidence that a reasonable jury could find either that ITSC did not breach the audit provision of the contract, or, that Hub was the first to materially breach the contract, allowing ITSC to suspend its duty of performance. Second, Hub has not shown that 1228 cannot recover in excess of $15,700 as a matter of law, and 1228 has set forth credible evidence showing it can recover in excess of the monthly minimum. However, 1228 certainly has not shown in its brief that it is entitled to over $820,000 in expectation damages; further proof of damages is needed. Third, Hub has failed to meet its burden of pointing to evidence that 1228 has no legitimate interest in this case.