IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE 1228 INVESTMENT GROUP, LP<br>Plaintiff,<br><br>v.<br><br>HUB GROUP, INC.<br>Defendant/Third Party Plaintiff,<br><br>v.<br><br>THEITSUPPORTCENTER, LLC<br>Third Party Defendant. | CIVIL ACTION<br><br><br><br><br>NO.  21-cv-1078 |

MEMORANDUM

**Hodge, J.**                                                                                                           **July 9, 2024**

In August 2020, Defendant/Third-Party Plaintiff Hub Group, Inc. ("Hub Group") contracted with Third-Party Defendant, the ITSupportCenter, LLC ("ITSC") for "computer support assistance and documentation of the support provided for products operated/used by the Hub Group." (SOW at ¶ 1.)[1] Hub Group reported that it experienced problems with ITSC's services almost immediately. (ECF No. 77 at ¶ 44.) ITSC and Plaintiff The 1228 Investment Group, LP ("1228") executed two (2) assignments. On March 4, 2021, ITSC and 1228 executed an assignment in which ITSC transferred to 1228 "all of [ITSC's] rights, title and interest in and to the Claim" (the "First Assignment"). (J3 at ITSC 01242.) The First Assignment stated that "as a result of the Breach, [ITSC] incurred certain monetary damages and is entitled to assert one or more claims and bring one or more causes of action against Hub Group (the "Claim")." (J3 at ITSC 01242.) The First Assignment defined "Breach" as Hub Group's: (i) fail[ure] to provide its employees with online portal access to [ITSC's] Services, and (ii) disconnecting its employees'

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

1

email access to [ITSC's] Services. (J3 at ITSC 01242.) The day after the First Assignment was executed, on March 5, 2021, 1228 sued Hub Group. (ECF No. 5 at ¶ 6.) On March 11, 2021, Hub Group terminated its contract with ITSC based on ITSC's alleged material breaches. (Exhibit D1.) On April 25, 2021, ITSC and 1228 executed another assignment (the "Second Assignment") of the "Second Breach Claim," which ITSC defined as "(a) disconnecting its employees['] telephone access to the Services; and (ii) failing and refusing to pay [ITSC's] invoices" after 1228's lawsuit was filed. (J3 at ITSC 01244.) On May 12, 2021, Hub Group filed its Answer to 1228's Amended Complaint and asserted counterclaims against ITSC for breach of contract and indemnification, asserting that ITSC's assignments to 1228 without Hub Group's consent constituted a material breach, along with various other performance issues. (ECF No. 6.)

The Court held a two-day bench trial beginning on February 26, 2024. Based upon its review of the evidence presented, assessment of the credibility of the witnesses, and application of the law the Court has made the following determinations set forth below.

- ITSC's assignment to 1228 without Hub Group's consent constituted a material breach. In light of that material breach coupled with other deficiencies with ITSC's performance, the Court finds that ITSC breached the Contract with Hub Group.
- As for 1228's breach of contract claim, the Court finds for Hub Group. Hub Group's disconnection from ITSC's email service on or about February 16, 2021 did not constitute a material breach. Moreover, based on the evidence presented to the Court, Hub Group's telephone disconnection took place in tandem with Hub Group's termination on March 11, 2021. The Court finds that the termination of the Contract by Hub Group was valid based on the conduct of ITSC and its material breach. However, 1228 is entitled to the unpaid invoices for the Base Amounts up to and until Hub

Group's termination. 1228 is not entitled to any lost profit damages after Hub Group's March 11, 2021 termination. (ECF No. 79 (citing Exhibit D1).)

The Court will enter judgment accordingly.

## I. FINDINGS OF FACT[2]

### A. The Parties

1228 is a Pennsylvania limited partnership with two limited partners: Jeffrey Becker and the Becker Family Trust. (ECF No. 5 at ¶¶ 1,3.) Hub Group is a publicly traded transportation management company that provides intermodal freight services, truck brokerage, dedicated trucking, warehouse consolidation, and logistics services. (ECF No. 6 at ¶ 2.) ITSC provides information technology help desk support and other related services to companies and their employees. (ECF No. 74 at ¶ 9.) Jeffrey Becker is a founder and director of ITSC. (ECF No. 26 at 6.)

### B. The Contract

Hub Group and ITSC entered into a Master Services Agreement ("MSA") and a Statement of Work ("SOW") (collectively, the "Contract") on August 28, 2020. (Exhibit J1 at ITSC 00001; Exhibit J2 at ITSC 00012.) As stated in the Contract, in the event of any conflict between the two documents, the applicable SOW was to control. (MSA at ¶ 1; *cf. id.* at ¶ 4 ("Unless otherwise expressly specified in an applicable SOW, [ITSC] acknowledges and understands that Hub Group has made no promises or representations whatsoever as to the amount or potential amount of business [ITSC] can expect at any time during the Term . . ."); *id.* at ¶ 18(a) (providing that "Hub Group may terminate this agreement" in a particular manner, "unless otherwise specified in a

---

[2] These findings of fact are based on the evidence presented during trial on February 26 and 27, 2024 as well as the parties' proposed findings of fact and conclusions of law submitted on March 8, 2024 (ECF Nos. 76, 79.) All findings are made by a preponderance of the evidence.

3

SOW").) The term of the Contract was for one year. (SOW at ¶ 4.) The SOW provided that ITSC "will furnish to Hub Group computer support assistance and documentation of the support provided for products operated/used by the Hub Group." (SOW at ¶ 1.) The SOW stated that Hub Group employees "shall have direct access" to ITSC's help desk services via (i) dialing an internal help desk phone number, (ii) submitting an email that routes directly to ITSC, and (iii) submitting an online portal/web form, regarding a number of service areas. (SOW at ¶ 11.) This section of the SOW was titled "Hub Group Access" which, by its title and description, states that the contract ensures Hub Group has access to ITSC and its services as stated in the SOW. (*Id.*)

The Contract also specified that ITSC would make certain documents available to Hub. The MSA stated in the provision titled "Record Keeping and Audit" (the "Audit Provision") that ITSC "shall maintain complete and accurate records of any invoices and supporting documentation for all amounts billed to, and payments made by, Hub Group . . ." (MSA at ¶ 7.) This Audit Provision further stated that, "[u]pon Hub Group's written request, [ITSC] shall provide to Hub Group . . . access at all reasonable times . . . to copies of such documentation and other data, records, and information . . . relating to the Services and each invoice as may be reasonably requested by Hub Group." (*Id.*) The purpose of such provision was to "conduct audits of the invoices to . . . examine [ITSC's] performance of the Services, that [ITSC's] charges are accurate and valid in accordance with [the Contract], and [ITSC's] compliance with the terms of [the Contract]." (*Id.*) The Audit Provision contemplated that there may be overcharges or undercharges, and upon discovery of such overcharge or undercharge, the liable party shall pay what is owed. (*Id.*) In addition, the SOW provided that "Hub Group will be granted web access to [ITSC's] servers to enable" real-time viewing of ITSC's helpdesk services. (SOW at ¶ 12.)

4

In exchange for support services and documentation, Hub Group would pay a monthly minimum of $15,700 to ITSC, for 6,200 "units" of support. (*Id.* at ¶ 2(b).) A unit corresponded to approximately one minute of support services. (*Id.*) If Hub Group did not use the entire 6,200-unit package for a given month, the unused monthly units would roll over to the following month. (*Id.* at ¶ 4.) On the other hand, if Hub Group required more than the 6,200-unit monthly commitment, ITSC would provide additional support units, called the Gap Amount.[3] (*Id.* at ¶ 6.)

Both the MSA and SOW provided for the termination of the Contract. Either party could terminate the contract within sixty (60) days of its commencement with fourteen (14) days written notice. (SOW at ¶ 5.) Hub Group could terminate without cause so long as it provided, in writing, at least sixty (60) days' notice to ITSC. (*Id.*) The Contract also contained a for-cause termination provision:

> If [ITSC] materially breaches any terms of this Agreement and/or any SOW and after receiving written notice of such material breach (i) such breach is incapable of cure after a twenty (20) day period of diligent effort to remedy the breach, or (ii) with respect to such breaches capable of cure, [ITSC] does not cure such breach within thirty (30) days or such other reasonable period as determined by Hub Group after written notice of material breach.

(MSA at ¶ 18(b).)

---

[3] Units of support service charges are calculated based on the following formula:
**On-line Support:**
Service Length Rate is calculated as follows
first 5 minutes or part thereof --- 1 unit per minute
minutes 6 to 10 --- .98 units per minute
minutes over 10 --- .96 units per minute
**Off-line Support:**
All off-line support is calculated at the rate of .95 units per minute for the length of research. (SOW ¶ 2(b).)

C. **Course of Performance and Alleged Breaches**

The term of the Contract began on October 15, 2020. (ECF No. 5 at ¶ 21.) In every month except the first, ITSC billed significantly more than the Base Amount. (Exhibits D3, D4, D5, D6, D7.) The evidence submitted by the parties shows that Hub Group and ITSC discussed how Hub Group could reduce its costs. (ECF No. 77 at ¶ 59–67, 69–74, ECF No. 78 at ¶ 32, 46.) 1228 argues that Hub Group was the first to breach by failing to provide Hub Group employees access to ITSC's services via a web portal, disconnecting Hub Group employees' email-based access to ITSC's services, and finally by disconnecting employees' telephone access to the help desk. (ECF No. 5 at ¶¶ 24–26.) By contrast, Hub Group argues that ITSC continuously engaged in minor breaches of the Contract beginning in December 2020 by means of "ticket mis-categorization," "failing to properly identify as Hub Group's IT Service Desk when answering support calls," "failing to follow written resolution/escalation procedures," "failing to adequately document work performed for Hub Group's follow-up," and "lack of troubleshooting experience." (ECF No. 6 at ¶ 12.) Hub Group points to evidence that it provided regular notice to ITSC of its failure to comply with the clear written terms of the Contract, but "ITSC failed to cure these prolonged and pervasive deficiencies within thirty (30) days of Hub Group sending notice to ITSC." (*Id.* at ¶¶ 14; *see, e.g.* ECF No. 77 at 15 (stating that "Hub Group submitted written requests for more detailed invoices from ITSC beginning in November of 2020, but ITSC failed to comply with Hub Group's requests.") (citing Exhibit D8 at HUB_00000336–38).)

D. **ITSC's Assignments and 1228's Lawsuit**

ITSC and 1228 executed two assignments. (ECF No. 79 at 19 (citing the First Assignment).) On March 4, 2021, ITSC and 1228 executed the First Assignment in which ITSC transferred to 1228 "all of [ITSC's] rights, title and interest in and to the Claim." (ECF No. 79 at

6

19 (citing the First Assignment).) The First Assignment stated that "as a result of the Breach, [ITSC] incurred certain monetary damages and is entitled to assert one or more claims and bring one or more causes of action against Hub (the 'Claim')." (*Id.*) The First Assignment defined "Breach" as Hub Group's: (i) fail[ure] to provide its employees with online portal access to [ITSC's] Services, and (ii) disconnecting its employees' email access to [ITSC's] Services. (*Id.*) The First Assignment also stated that "it is not intended to transfer from [ITSC] to [1228] any rights or obligations under the Agreement, other than the assignment of the Claim." (*Id.*) 1228 paid ITSC $258,000.00 for "all of the rights, title and interest of [ITSC] in, to, and under the Claim." (*Id.*) It is undisputed that ITSC did not seek or receive Hub's consent prior to executing the First Assignment. (ECF No. 67 at ¶ 14.) The day after the First Assignment was executed, on March 5, 2021, 1228 sued Hub Group and claimed that ITSC assigned all of ITSC's "rights, title, and interest" in any causes of action against Hub Group under the Contract to 1228 on the day before 1228 filed suit. (ECF No. 5 at ¶ 6.)

Hub Group interpreted the First Assignment as a material breach, and thereafter sent a Notice of Material Breach and Termination to ITSC. (ECF No. 6-1 (citing Notice of Material Breach and Termination Letter (Mar. 11, 2021)).) In its notice of termination, Hub Group disputed its obligation to pay ITSC's invoices including the unpaid invoices dated February 2, 2021 and March 9, 2021 due to their lack of detail and support to substantiate the charges and ITSC's failure to provide sufficient details in response to Hub Group's repeated requests. (ECF No. 79 at 21.)

On April 25, 2021, ITSC and 1228 executed the Second Assignment. (J3 at ITSC 01244.) In the Second Assignment, ITSC assigned to 1228 a "Second Breach Claim" and defined "Second Breach" as Hub Group's: "(i) disconnecting its employees telephone access to the Services; and (ii) failing and refusing to pay [ITSC] invoices" after 1228's lawsuit was filed. (*Id.*) 1228 paid

ITSC $637,000.00 for "all of the rights, title and interest of [ITSC] in, to, and under the Second Breach Claim." (*Id.*) ITSC therefore received $258,000.00 as consideration for the First Assignment from 1228, $637,000 for the Second Assignment from 1228, and $210,132.42 for the first four invoices from Hub Group. (ECF No. 79 at 22.) These amounts total $1,105,132.42. (*Id.*) On April 28, 2021, 1228 filed its Amended Complaint claiming that Hub Group's termination of the Contract including disconnecting all access its employees had with ITSC was an additional breach entitling 1228 to recover the revenue it claimed entitlement to under the Contract. (ECF No. 5.)

## II.   DISCUSSION

1228 brings a breach of contract claim against Hub Group. (ECF No. 5 at ¶¶ 30–33.) Hub Group brings breach of contract and indemnification claims against ITSC. (ECF No. 6 at ¶¶ 31–38.) Hub Group requests that the Court order ITSC to indemnify Hub Group if ITSC's failures to perform under the Contract result in liability to 1228. (ECF No. 79 at 32.) Hub Group also requests that if the Court orders ITSC to indemnify it, the Court hold a post-trial lodestar hearing to determine the reasonable attorneys' fees ITSC owes Hub Group. (ECF No. 79 at 53.)

Under Pennsylvania law, a party alleging breach of contract "must establish (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (internal quotation marks and citation omitted). The existence of a contract and its essential terms are not disputed in this case. The parties dispute whether they committed a breach of their duties as agreed to in the Contract as well as the potential resultant damages.

"[A] material breach of a contract relieves the non-breaching party from any continuing duty of performance thereunder." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009) (citing *Berkowitz v. Mayflower Sec.*, 317 A.2d 584, 586 (Pa. 1974)). More specifically, "when there is a breach of contract going directly to the essence of the contract, which is so exceedingly grave as to irreparably damage the trust between the contracting parties, the non-breaching party may terminate the contract without notice, absent explicit contractual provisions to the contrary." *LJL Transp.*, 962 A.2d at 652.

Based on the evidence presented at trial, the Court concludes Hub Group did not breach its Contract with ITSC. The Court finds that ITSC did breach its contract with Hub Group. The Court does not find that Hub Group is entitled to indemnification. Judgment will be entered accordingly.

**A.**     **Champerty**

Hub Group asserts that 1228's claims should be dismissed because ITSC's assignments to 1228 are invalid under the doctrine of champerty. (ECF No. 79 at 33.) Hub Group also sought dismissal of the 1228's claims at the summary judgment stage on this basis. (ECF No. 25-2 at 19–23.) Black's Law Dictionary defines champerty as:

> [a]n agreement between an officious intermeddler in a lawsuit and litigant by which the intermeddler helps pursue the litigant's claim as consideration for receiving part of any judgment proceeds; . . . an agreement to divide litigation proceeds between the owner of the litigated claim and a party unrelated to the lawsuit who supports or helps enforce the claim.

*Frank v. TeWinkle*, 45 A.3d 434, 438 (Pa. Super. Ct. 2012) (quoting Black's Law Dictionary (4th ed.)). In other words, champerty is "a bargain by a stranger with a party to a suit, by which such third person undertakes to carry on the litigation at his own cost and risk, in consideration of receiving, if successful, a part of the proceeds or subject to be recovered. *Belfonte v. Miller*, 243 A.2d 150, 152 (Pa. Super. Ct. 1968) (en banc). "Under Pennsylvania law, if an assignment is

9

champertous, it is invalid. *Frank*, 45 A.3d at 438 (citing *Belfonte*, 243 A.2d at 152). "An assignment is champertous when the party involved: (1) has no legitimate interest in the suit, but for the agreement; (2) expends his own money in prosecuting the suit; and (3) is entitled by the bargain to share in the proceeds of the suit." *Id.* at 438–39 (citing *Belfonte*, 243 A.2d at 152).

The Court incorporates by reference its previous finding that the latter two prongs of *Frank* are met, which is undisputed by either party. (ECF No. 29 at 18.) The Court now finds that, considering the evidence presented at trial, Hub Group still has not met its burden of showing that 1228 has no legitimate interest in the case, given Mr. Becker's significant involvement and financial interest in both 1228 and ITSC. *See also 1228 Inv. Grp., L.P. v. BWAY Corp.*, No. 20-4328, 2021 WL 3511303, at *3 (E.D. Pa. Aug. 9, 2021) (stating that, in a similar case in which 1228 was assigned a claim by ITSC, "1228 is no stranger to this litigation.") Therefore, 1228's claims are not dismissed based upon the doctrine of champerty.

**B.      ITSC Breached the Contract**

ITSC materially breached the Contract in several different ways, based upon the evidence that was presented at trial and argued by Hub Group. Specifically, ITSC breached the anti-assignment (the "Anti-Assignment Provision"), confidentiality (the "Confidentiality Provision"), and Audit Provisions of the Contract. The basis for the Court's finding in determining each breach is discussed in greater detail below.

   **i.      ITSC Breached the Anti-Assignment Provision of the Contract**

Hub Group alleges that ITSC materially breached the Anti-Assignment Provision of the Contract by assigning its obligations, rights, title and interest in and to the claims against Hub Group without Hub Group's prior written approval. (ECF No. 79 at 26 (citing MSA at ¶ 12).) ITSC contends that only its breach of contract claims were assigned to 1228, and each assignment stated

that it was "not intended to transfer from [ITSC] to [1228] any rights or obligations under the Agreement, other than the assignment of [ITSC's breach-of-contract claims, and n]othing in this Assignment is intended to release [ITSC] of any obligations that may remain under the Agreement with respect to [Support] Services." (ECF No. 76 at 51 (citing the First Assignment).) ITSC maintains that, because of the limited nature of the assignment, it did not breach the Anti-Assignment Provision. (*Id.* at 53.) Moreover, ITSC asserts that "[t]aking the language of the Anti-Assignment Provision, together with the nature of the parties' relationship and the purpose of the Agreement, it is clear that the Anti-Assignment Provision only prohibits assignment of the substantive rights and obligations under the Agreement . . . not assignments of a party's breach-of-contract claims against the other party." (ECF No. 76 at 51–52.)

The Anti-Assignment provision states: "[e]xcept as set forth herein, neither party shall assign this Agreement or any rights, duties, or obligations in it to any other person and/or any entity without the prior written approval of the other party." (ECF No. 76 at 13–14 (citing MSA at ¶ 23).) ITSC asserts, in essence, that it had the right to unilaterally make a piecemeal assignment of its rights, duties, or obligations under the Contract because it labeled its assignment as not assigning "substantive rights and obligations." The Court disagrees that ITSC was entitled to unilaterally make any qualified or limited assignment. Based upon the plain language of the Anti-Assignment provision, the Court agrees with Hub Group that by assigning its obligations, rights, title, and interest in and to its claims against Hub Group without Hub Group's prior written approval when it executed the First Assignment on March 4, 2021, 1228 materially breached the Anti-Assignment provision of the Contract.

11

### ii. ITSC Breached the Audit Provision of the Contract

Hub Group claims that ITSC breached the Contract by failing to provide (1) invoices and supporting documentation to Hub Group that contained sufficient detail of the work ITSC performed; and (2) failing to provide invoices to Hub Group in a format reasonably acceptable to Hub Group. (MSA at ¶ 5, ECF No. 79 at 26.) The MSA includes the following provision with respect to ITSC's obligations to maintain records, and, upon request, provide access to such records to Hub Group for auditing purposes:

> **Record Keeping and Audit.** [ITSC] shall maintain complete and accurate records of any invoices and supporting documentation for all amounts billed to, and payments made by, Hub Group or its affiliates under this Agreement, and shall retain any such records for three (3) years after completion of the Services. Upon Hub Group's written request, [ITSC] shall provide to Hub Group or its designee access at all reasonable times to . . . copies of such documentation and other data, records and information (including financial books and records) relating to the Services and each invoice as may be reasonably requested by Hub Group . . . [ITSC] shall, at no additional expense to Hub Group, assist and cooperate in any audit of such records that Hub Group may undertake.

(ECF No. 76 at 12–13 (citing MSA at ¶ 7).) ITSC asserts that it did not fail to provide Hub Group with information pertaining to the support services in violation of the Audit Provision because: (1) it provided Hub Group with all of the information it had access to; and (2) Hub Group had access to more information than ITSC. (ECF No. 76 at 43, 48.)

The trial testimony of Hub Group's Assistant Vice President, Technology Solutions, Max Paredes is contrary to ITSC's position and credibly demonstrates to the Court that ITSC failed to comply with the Audit Provision of the Contract. Paredes' testimony highlights a number of deficiencies in ITSC's monthly invoices, including that they only provided detail on the number of units billed and the rate charged depending on whether the units were part of the base charges or the overage Gap Amounts (ECF No. 77 at ¶ 88), and they lacked any details that would allow Hub Group to assess the propriety of ITSC's charges (*Id.* at ¶ 89 (citing D3 at ITSC 00155, D4 at

ITSC 00161, D5 at ITSC 00167, D6 at ITSC 00170).) Despite Hub Group's repeated requests for more detailed invoices beginning in November of 2020, ITSC never provided data to show the time it took to resolve each service request. (*Id.* at ¶¶ 93, 95, 97.) The Court finds it difficult to believe that ITSC was unable to provide detailed data such as showing the time it took to resolve each service request. It appears to this Court that the accurate capturing of time would be a fundamental data point that ITSC agreed to provide regardless of whether or not it believes Hub Group already had that information available to it.

Such deficiencies are particularly egregious given that there were several indications that ITSC's invoices were inaccurate. For example, when the number of calls to ITSC decreased, which should have led to a lower number of units being used, the average time it took ITSC to resolve each call increased significantly, thereby increasing the Gap Amounts owed by Hub Group. (*Id.* at ¶ 102.) Another area of concern for Hub Group was the number of units ITSC purportedly expended on password resets. Hub Group has between 4500 and 4800 employees. In the first two weeks of the Contract's term, ITSC claimed it spent 6795 units resetting 1709 passwords. In the months that followed, ITSC invoiced Hub Group 8423.06 units spent resetting 2722 passwords in November, 6621.90 units resetting 1892 passwords in December, and 7522.01 units resetting 2154 in January. (*Id.* at ¶ 104.) These numbers were not consistent with Hub Group's past experience. (*Id.* at ¶ 106.) The Court finds Hub Group's request for specificity in the billing and invoices was reasonable under the Audit Provision. Further, the Court finds that ITSC's failure to provide invoices and supporting documentation to Hub Group that contained sufficient detail of the work ITSC performed constituted a material breach of the Contract. (ECF No. 79 at 26.)

### iii. ITSC Breached the Confidentiality Provision of the Contract

Hub Group alleges that ITSC materially breached the Contract's Confidentiality Provision by disclosing to 1228 that ITSC was performing services for Hub Group, and publicly disclosing that ITSC provided services to Hub Group when its assignee, 1228, filed its complaint against Hub Group (the "Assignment Breach"). (ECF No. 79 at 25 (citing MSA at ¶ 12).) ITSC contends that Hub Group failed to demonstrate that the business relationship between Hub Group and ITSC constituted "Confidential Information," and even if it had, Hub Group failed to prove that there was any disclosure by ITSC. (ECF No. 76 at 49.) The text of the Contract is clear. The Contract prohibited the disclosure to third parties of each party's confidential information including "the identity of Hub Group and the fact that [ITSC] is performing services for Hub Group." (ECF No. 79 at 25 (citing MSA at ¶ 12).) The Court finds that ITSC's disclosure that it was providing services to Hub Group, to 1228 through its assignment, and publicly when it filed suit, constituted a material breach of the Contract.

### iv. Hub Group Is Not Entitled to Indemnification

Section 19(a) of the MSA reads as follows:

> [ITSC] shall indemnify, defend, and hold harmless Hub Group and its affiliates and their respective shareholders, directors, officers and employees for any and all third party loss, costs, damages and expenses (including reasonable attorneys' fees) (collectively, "Claims") arising or resulting from or in connection with (i) any negligence or gross or willful misconduct on the part of [ITSC] or its Personnel, managers, members, officers or agents in the provision of Services pursuant to this Agreement and any SOW; and (ii) any breach of [ITSC's] or its Personnel's obligations under this Agreement, including any representations, warranties or covenants.

(MSA at ¶ 19(a).) Hub Group is not seeking indemnification from ITSC based upon negligence or willful misconduct but rather in connection with the expenses in its defense of this lawsuit. (ECF No. 79 at 33.)

"Indemnity agreements are to be narrowly interpreted in light of the parties' intentions as evidenced by the entire contract." *Burlington Coat Factory of Pennsylvania, LLC v. Grace Const. Mgmt. Co., LLC*, 126 A.3d 1010, 1022 (Pa. Super. Ct. 2015) (quoting *Consol. Rail Corp. v. Delaware River Port Auth.*, 880 A.2d 628, 632 (Pa. Super. Ct. 2005)). The third-party expenses that Hub Group has incurred in its defense of this lawsuit are in connection with 1228's allegations that Hub Group breached the Contract — *not* based upon Hub Group's claims that ITSC breached the Contract. Therefore, the expenses it seeks to recover were not incurred based upon ITSC's breach. As such, Hub Group is not entitled to indemnity based upon the plain language of the MSA.

**C.    Hub Group Did Not Breach the Contract**

    **i.    Hub Group's Disconnection of Email and Telephone Access Did Not Constitute a Breach**

Hub Group disconnected its employees' (i) email access to the ITSC's technicians on or about February 16, 2021; and (ii) telephone access to the support services on or about March 10, 2021 – both dates are before the end of the initial Contract term. (ECF Doc. No. 67 at 2.) Throughout the Contract term, following its signing in August 2020 and commencement in October 2020, Hub Group was working with a contractor to build an online portal by which its employees could access ITSC's support services. (ECF No. 77 at ¶¶ 114, 115.) This was known by ITSC and did not impede ITSC from providing services nor Hub Group from providing payment for those services from October 2020 to February 2021. (*Id.*) 1228 contends that the disconnection of ITSC's email and telephone access was a breach of a provision of the SOW governing Hub Group employees' access to ITSC's support services (the "Access Provision"). (ECF No. 76 at 27–30.) Hub Group disagrees, asserting that the Access Provision placed an obligation on ITSC to provide access to Hub Group's employees but did not place an obligation

15

on Hub Group to use ITSC's support services beyond the contracted for minimum monthly commitment of 6,200 units. (ECF No. 79 at 27.) ITSC never notified Hub Group before filing suit that it considered Hub Group's eliminating its employees' email access or failing to provide online portal access as a breach of the parties Contract. (ECF No. 77 at ¶¶ 114, 115.)

> The Access Provision reads as follows:
>
> For the duration of this SOW Hub Group's employees shall have direct access to [ITSC's] consultants via, i) dialing an internal help desk phone number that either directly or via a dedicated verbal phone menu option directly transfers all callers to [ITSC], ii) submitting an email that will route directly to [ITSC] and iii) submitting an online portal/web form request that will route directly to [ITSC] . . .

(SOW at ¶ 4.) The Court agrees with Hub Group that, based upon the plain language of the Access Provision, it places an obligation on ITSC to make its services available rather than placing a usage requirement on Hub Group. (ECF No. 77 at ¶¶ 114, 115.) Hub Group rerouted its employees' emails and calls away from ITSC based upon ITSC's recommendation that it reduce or eliminate its employees' email access to address the increasing month-over-month spend on ITSC's support services. (Exhibit P8 at ITSC 01239.)[4] Moreover, the MSA contains a non-exclusivity provision, which states the following:

> Hub Group may, in its sole discretion, perform for itself, or enter into arrangements with third parties to perform for Hub Group, services the same as, or comparable to the Services. Unless otherwise expressly specified in an applicable SOW, [ITSC] acknowledges and understands that Hub Group has made no promises or representations whatsoever as to the amount or potential amount of business [ITSC] can expect at any time . . .

MSA at ¶ 4. While ITSC asserts that this provision of the MSA is in conflict with — and therefore superseded by — the SOW, the Court disagrees. Reading the MSA and SOW together, along with

---

[4] 1228's Exhibit P8 is a PowerPoint presentation entitled Hub Group Service and Cost Plan. The cited slide is entitled Cost Management for 60%+ Savings. On this slide, ITSC suggests that "[b]est practices of organizations at Hub's size include eliminating or significantly restricting the use of email for seeking support."

ITSC's course of conduct accepting that Hub Group had not yet set up a web portal, the Court finds that Hub Group's failure to set up a web portal prior to the commencement of the Contract was not seen as material breach by ITSC. Moreover, based upon ITSC's encouraging Hub Group to eliminate its email access, the Court finds that Hub Group's eventual disconnection of its employees' email access did not constitute a breach.

Finally, Hub Group disconnected its employees access to ITSC's telephone support service on March 10, 2021 – after Hub Group became aware of the assignment of its claims by ITSC to 1228 and ITSC filing suit, which Hub Group determined to be a material breach of the Contract. Because Hub Group's disconnection of telephone support service occurred after the assignment by ITSC to 1228, the Court finds that Hub Group's disconnection from ITSC's telephone support service was not a breach.

### ii.  Hub Group's Failure to Pay Certain Invoices Did Not Constitute a Breach

1228 alleges that Hub Group breached the Contract by failing to pay the invoices dated February 2, 2021, March 9, 2021, and April 21, 2021 (the "Unpaid Invoices") within thirty days of Hub Group's receipt thereof (the "Payment Breach"). (ECF No. 31.) Hub Group points to its March 11, 2021 notice of termination in which it "disputed its obligation to pay ITSC's invoices including the unpaid invoices dated February 2, 2021 and March 9, 2021 due to their lack of detail and support to substantiate the charges and ITSC's failure to provide sufficient details in response to Hub Group's repeated requests." (ECF No. 79.) The Court finds that Hub Group was entitled to terminate the Contract upon what Hub Group believed were ITSC's material breaches which were incapable of cure. (MSA at ¶ 18(b).) ITSC's breach of the Anti-Assignment Provision via the First Assignment and breach of the Confidentiality Provision when it filed suit were incapable of cure. Thus, Hub Group is only obligated to pay the monthly Base Amounts under the Contract up to and

including March 10, 2021, a day before Hub Group provided its written notice of termination of the Contract to ITSC. (ECF No. 79 (citing Exhibit D1).) [5]

## III. DAMAGES

1228 asks the Court to award $1,383,502.03 in damages in light of what it alleges are the Payment Breach and Disconnection Breaches and based upon Gap Units that would have been utilized and telecom fees that would have been due during the remainder of the Contract term. In light of the Court not finding a breach by Hub Group for ITSC, ITSC's requests for damages is denied. Hub Group asks the Court to award $160,052.74 in damages, consisting of (1) the $154,052.74 in Gap Amount charges that it paid but that it claims that "ITSC could not, and to date cannot, support with sufficient documentation"; and (2) the $6,000 of credit that ITSC promised but never issued. (ECF No. 79 at 23.)

After thoughtful deliberation, the Court finds that Hub Group is only obligated to pay 1228 the monthly Base Amounts under the Contract through March 10, 2021, based upon its termination letter notifying ITSC of its material breaches and terminating the contract effective as of March 11, 2021. (ECF No. 79 at 30.) The Contract did not require Hub Group to use any additional minutes of support service beyond the Base Amount. (ECF No. 79 at 27(citing SOW at ¶ 2(b) ("Hub Group has contracted for a monthly commitment of <u>6,200</u> units of support services at a cost of <u>$15,700</u>.") (emphasis in original); ¶ 6 (describing Gap Amounts billed when Base Amounts exhausted but not requiring Hub Group to purchase Gap Amounts).) Hub Group is therefore

---

[5] Hub Group concedes it is obligated to pay the monthly Base Amounts under the Contract up to when it sent its written termination notice on March 11, 2021. (ECF No. 79 at 30 ("Hub Group is only obligated to pay the monthly Base Amounts under the Agreement up until, and including, March 2021 when Hub Group sent its written notice of ITSC's material breaches to ITSC . . . [t]hat amount is $15,700 for February's Base Amount, $15,700 for January's Base Amount, and $5,233 for the first ten days of March's Base Amount, for a total of $36,633.").)

obligated to pay $36,633 (consisting of the Base Amount ($15,700) for January and February and a prorated Base Amount of $5,233 for the first ten days of March). (ECF No. 79 at 30.) In this case the Court must apply Pennsylvania state law to determine the rate of prejudgment interest. *TZE Glob. Dis Ticaret A.S. v. Papers Unlimited*, *Inc.*, No. 20-cv-02600, 2023 U.S. Dist. LEXIS 77765, at *27 (E.D. Pa. May 4, 2023) (citing *Yohannon v. Keene Corp.*, 924 F.2d 1255, 1265 (3d Cir. 1991)) (holding that "[i]in federal cases based on diversity jurisdiction, the Court must apply state law to determine the rate of prejudgment interest.")[6] Therefore, Hub Group owes 6% per annum prejudgment interest for the invoiced but unpaid Base Amounts. (*See* 41 Pa. Stat. Ann. § 202.)

Further, the Court finds that Hub Group is entitled to $154,052.74 in damages from ITSC. Lastly, Hub Group is not entitled to the $6,000 credit that ITSC offered in order to offset the unexpectedly high Gap Amounts because the Court is not requiring Hub Group to pay those Gap Amounts.

## IV.   CONCLUSION

ITSC breached the Anti-Assignment, Audit, and Confidentiality Provisions of the Contract. Hub Group was entitled to terminate the Contract upon ITSC's uncurable material breaches, which it did on March 11, 2021. There was no obligation on Hub Group's part to continue to accept ITSC's services and to pay the Base Amounts and Gap Amounts following ITSC's material breach of the Contract. 1228 shall recover $36,633 plus 6% per annum prejudgment interest for the invoiced but unpaid Base Amounts before it terminated the Contract from Hub Group, but it is unable to recover any lost profit damages based upon its breach of contract claim.

---

[6] 1228 is not entitled to recover the contractual interest set forth in the SOW because Hub Group did not consent to the First or Second Assignments to 1228, invalidating 1228's entitlement to enforce any rights under the Contract. (SOW at ¶ 6.)

Accordingly, the Court finds in favor of Hub Group on 1228's breach of contract claim and in favor of Hub Group on its breach of contract claim against ITSC. The Court finds for ITSC on Hub Group's indemnification claim.

An appropriate judgment follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**
